IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CR. NO. 3:05cr187-LSC |
| ) | WO |
| SAWELIJA TYREE FLOYD ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This case is before the court on defendant Floyd's motion to suppress all physical evidence seized and statements taken as a result of the search of his home and his arrest on July 29, 2005.  For the reasons discussed below, the motion is due to be denied.

**Facts**

In December or January, 2005, the Auburn, Alabama police department began investigating Tyrone White, a police officer then employed by the department, for "fixing tickets." On July 27, 2005, Lt. Jerry Holder and Sgt. Chris Murray met with Auburn Municipal Judge Joe Bailey.  Lt. Holder had a list of people whose court files he wanted Judge Bailey to review in connection with the Tyrone White investigation.  On that list was defendant Tyree Floyd.  The officers believed, based on a statement in their possession, that White had helped Floyd get a favorable plea agreement in a case before Judge Bailey.

The Auburn police officers wanted to talk with defendant Floyd – and, the court infers, with others on the list – about the investigation of White.  Judge Bailey reviewed Floyd's file in the presence of the officers. He decided to issue a VCO (Violation of Court Order) order for Floyd's arrest, an order used routinely by the municipal court as a "pickup"

order for those on suspended sentences.  Judge Bailey believed that Floyd had violated a condition of his two-year probation[1] on a previous conviction (in May, 2004) for driving with a revoked license by incurring another conviction for disorderly conduct in February 2005.[2] Judge Bailey also believed that Floyd had associated with known criminals and failed to cooperate with the Auburn police department in its investigation of White.[3]  White had persuaded Judge Bailey to suspend the 30 day jail sentence that he normally would have

---

[1] Judge Bailey testified at the suppression hearing in this case that he uses a municipal court unsupervised suspended sentence as unsupervised probation. According to Judge Bailey, two years is the term of probation in all cases, and there is a standard order to the effect that the term of probation is two years, although he did not know what the clerk's procedure was for providing that order to each defendant.  A police officer, the court clerk, and the judge all testified that it is Bailey's practice to inform defendants orally that he is going to suspend the jail sentence, and that as long as they are not in any other trouble, and they do everything the court instructs them to do for two years, the matter will be terminated, or words to that effect.  Because the municipal court is not a court of record, no recording or transcript is available to confirm or refute these contentions. There is no written record in Floyd's court file that he was told that his term of probation on the suspended sentence was two years, nor is there any evidence that he received a written order specifying the terms of his probation.

[2] Judge Bailey testified that he issued the pickup order because he had been advised a week to ten days prior to the date of the order that Floyd was not complying with an Auburn police department investigation, presumably that of White. (He initially said that he advised Floyd that he wanted his full and complete cooperation with the Auburn PD and the FBI during Floyd's due process hearing.  However, that hearing may not have ever taken place – and, if it did, it would have occurred after, not before the pickup order was issued.)  Judge Bailey initially indicated that another reason for the pickup order was that defendant failed to pay his fines on schedule, but he did not include that reason when he explained the VCO after he reviewed the defendant's file in court.  Defendant affirmatively demonstrated that his fines were paid prior to the issuance of the order.

[3] The VCO order did not indicate the specific reason for its issuance on its face. According to Judge Bailey, his practice was to advise the defendant of the reason he was arrested at a due process hearing on the next regular business day.  Bailey testified that he did hold a due process hearing in Floyd's case.  However, officers indicated that Floyd was released prior to a hearing when he bonded out on the drug charges.

imposed on Floyd for the disorderly conduct conviction, and Judge Bailey believed that he had been improperly manipulated into doing so.

On Friday, July 29, 2005, officers from the Auburn police department, including Lt. Holder and Sgt. Murray, approached the front door of defendant's residence, a two-bedroom duplex. The officers went to the residence to arrest Floyd pursuant to the VCO order. They also wanted to talk with Floyd concerning the White investigation. Four officers in plain clothes approached the front of the duplex at approximately 10:30 a.m., while two others (one of them in uniform) went to the rear.[4] One of the officers knocked on the front door. A male voice said, "Who is it?" One of the officers, Sgt. James Tatum, replied, "Police department, open the door."[5]

Within 30 seconds to a minute, Floyd's girlfriend, Jamillah McCray, opened the door "all the way up." McCray was known to the officers from previous calls to her residence and that of her grandmother. As soon as McCray opened the door, Tatum asked her where Floyd was. The officers detected a strong odor of burning marijuana coming out of the residence.

---

[4] The officers had information prior to service of the VCO order that Floyd was involved in the drug trade. The officers experience is that three quarters of violent crime is somehow related to drug activity or drug abuse, and that drug distributors are likely to be armed with firearms. Murray indicated that officers take extra care when executing warrants on drug dealers for that reason.

[5] Sgt. Murray initially did not indicate that Sgt. Tatum added, "open the door" after identifying the police department. However, Lt. Holder recalled that Tatum said, "[P]olice, police department or police officer, come to the door." In response to further questioning, Holder agreed that a statement that he wrote on the day of the arrest indicated that Tatum had replied, "Police, open the door." The court finds that "Police, open the door" is most likely to be the phrase actually used by Tatum, as this reply was recorded in a written report on the date of the arrest.

Lt. Holder commented on the smell to the other officers. By this point, four to five officers had gathered at the door. Floyd came to the front door almost immediately. One of the officers told Floyd that he had a warrant for his arrest and asked him to step outside. Floyd did so, and was taken into custody. An officer read Floyd his Miranda rights. Floyd thereafter made a statement to officers that the drugs in the residence were his.

While Floyd was being arrested, four of the officers stepped inside to secure the residence and to keep evidence from being destroyed because they smelled burning marijuana. They asked McCray, who was just inside the front door with Mitchell, if there were any other persons present, and if there were firearms in the residence. McCray said that no-one else was there, but there was a weapon in the bedroom. McCray led the officers to the weapon. As officers entered the residence, they observed three or four fairly large pieces of crack cocaine on the kitchen counter, along with a box of baking soda and some kind of cooking device. McCray and Mitchell were placed in handcuffs and Mirandized. When both McCray and Floyd declined to consent to a search, the officers secured the residence and obtained a search warrant from Lee County District Judge Russell Bush before searching further or seizing evidence.

When police executed the warrant, they found, in addition to the crack cocaine they had previously observed, more crack cocaine inside a brown paper bag in the bedroom (for a total of 310-312 grams), some powder cocaine (587 grams), and a large trash bag containing several bags of marijuana (a little over 19 pounds). They also found a piece of a blunt and a small plastic bag of marijuana in or on the toilet, and several sets of scales, some

plastic bags, and $3000 in U.S. currency in the house.  Thereafter, Floyd signed a Miranda waiver form and then signed a written confession admitting to ownership of the confiscated drugs.

The VCO order directed the clerk of the municipal court to set Floyd's case for a hearing "on the next regular business day after ... Defendant is in custody."  Because Floyd was picked up on a Friday, the next regular business day was Monday, August 1, 2005.  Judge Bailey released Floyd by written order, pending further order of the court, on August 1after Floyd made bond on the drug charges.  Floyd agreed "in some part" to cooperate with the investigation into the drug arrest. Police also took a statement from him regarding Tyrone White.

## Discussion

Defendant contends that the officer's initial entry into the defendant's residence was illegal because the VCO order was invalid, and because the order was without probable cause and was issued as a pretext to obtain the arrest and interrogation of defendant Floyd for the benefit of the officers conducting the Tyrone White investigation.  Defendant also maintains that the opening of the residence was involuntary and without the consent of the occupants, and that the opening of the residence did not create probable cause and exigent circumstances sufficient to justify entry into the residence by the officers.  He argues that the search warrant signed by Judge Bush after the initial entry must be invalidated because it relied on evidence that was obtained illegally, and that defendant's post-arrest statements should be suppressed because his arrest was illegal.

5

The government concedes that the Auburn municipal court could not lawfully revoke Floyd's probation on his May 2004 suspended sentence because the court had not previously provided Floyd with a written copy of the conditions of his probation as required by Alabama law.[6] However, the government maintains that the officers relied in good faith on the municipal court's VCO order in arresting Floyd, and argues that the warrantless entry was not pretextual. Further, the government contends that an occupant of the residence, not the officers, opened the residence, and that the officers did not enter to arrest Floyd (who stepped outside for that purpose) but to secure the residence only after they smelled the odor of burning marijuana emanating from the open door. The government argues that the smell of burning marijuana justified police in entering and securing the residence to prevent the destruction of evidence while they obtained a valid search warrant, after the residents declined to consent to a search of the residence. With regard to Floyd's statements, the government maintains that he did not make statements as a result of interrogation and, even assuming that he did respond to questioning while in custody, his detention was legal because it was based on an order that officers believed to be valid, and sufficient time elapsed between the officers' contact with Floyd and the time at which he signed the Miranda waiver form to cleanse any taint from an arrest on an invalid warrant.

Good Faith Exception

Because the government concedes in this case that the VCO order issued by the

---

[6] Owens v. State, 887 So. 2d 1015, 1017 (Ala. Crim App. 2004); Ala. Code §12-14-13; Ala. R. Crim. P. 1.1, 27.1.

municipal judge was not valid under Alabama law, the court begins its analysis by examining whether or not the officers executing the arrest order nevertheless relied on the order in good faith. In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court carved out a good faith exception to the exclusionary rule, holding that the rule does not apply to evidence seized by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate that is subsequently found to be invalid. The focus of the inquiry is "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n. 23. The Leon good faith exception has been invoked in the context of arrest warrants as well as search warrants. See Arizona v. Evans, 514 U.S. 1 (1995).

"The Leon good faith exception applies in all but four limited sets of circumstances...: (1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned his judicial role ...'; (3) where the affidavit supporting the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where, depending upon the circumstances of the particular case, a warrant is 'so facially deficient--i.e., in failing to particularize the place to be searched or the things to be seized--that the executing officers cannot reasonably presume it to be valid.'" United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002) (citations omitted).

None of these circumstances is present in this case. Here, the municipal judge was

not misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. Instead, the judge issued the pickup order in question on his own motion. His decision to do so was not based on an affidavit from police, but on his review of defendant's case file. Further, the court is unpersuaded that Judge Bailey "wholly abandoned his judicial role" in preparing the VCO order. He did not initiate the meeting; instead, Lt. Holder asked the judge to review Floyd's case file along with a list of other files in connection with Holder's investigation. Rather than "rubber stamping" any request from Holder, the judge conducted an independent review of the file and determined for himself, without any apparent input from the officers, that Floyd was in violation of his probation or suspended sentence. In his judicial role, Judge Bailey prepares VCO orders routinely, using a standard form on his computer. He issued several other VCO orders for other individuals on Holder's list.

   The court cannot conclude that the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, as no affidavit was required for the VCO order, which was essentially a bench warrant. The officers actually observed Judge Bailey as he reviewed Floyd's case file and made the determination that a violation had occurred. They had no reason to doubt the judge's view that Floyd had violated his probation, nor to question whether that determination constituted a sufficient finding of probable cause to arrest.

   In addition, the VCO order was not so facially deficient that the executing officers could not reasonably presume it to be valid. Nothing about the order itself would have

alerted the officers that it was not a valid order. The order provided, *inter alia*:

> For good cause shown, it is the Court's opinion that the above-named Defendant should be taken into custody and incarcerated in the Lee County Jail to serve the balance of the sentence(s) of incarceration heretofore suspended reimbursing the City/County for all medical expenses.
>
> The Clerk is directed to set this matter for hearing on the next regular business day after said Defendant is in custody.

The VCO order is properly signed and dated and the case style is correct. The order clearly indicates the individual for whom the pickup order was intended. The officers did not think the order was unusual in failing to state the crime that was allegedly committed with any greater particularity. As one officer indicated, "I don't know that the judge has to specify that on an order that he gives."

According to the officers' uncontradicted testimony, the Auburn police department routinely serves VCO orders on people who violate their probation with the municipal court. There was no case number on this VCO order, but the officers believed that this was so because some employees in the court clerk's office were suspected of being involved in White's alleged ticket fixing, and it was their understanding that the warrant was given directly to Lt. Holder, rather than being routed through the clerk's office, to be kept confidential until they decided the execute it.[7] In fact, most of the time the officers do not have even have the VCO orders (or a case number) with them when they make an arrest. The pickup order is generally enforced on a traffic stop based on a "radio hit" about the

---

[7] In fact, Judge Bailey testified that, having no secretarial staff, he does all his own typing, and he "simply failed to type the case number on the order."

9

defendant.

In this case it is clear that the officers acted in objectively reasonable reliance on the VCO order in arresting Floyd. Any error concerning the order under the Alabama Rules of Criminal Procedure or other state law was attributable solely to the municipal judge, not to police. Clearly, application of the Leon good faith exception here "is justified because 'the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." United States v. Ellis, 971 F.2d 701, 704 (11th Cir. 1992) (citation omitted); see also Arizona v. Evans, 514 U.S. 1, 8 (1995) (Noting that there is no sound reason to apply the exclusionary rule as a means of deterring misconduct on the part of judicial officers who are responsible for issuing warrants.); Massachusetts v. Sheppard, 468 U.S. 981, 990 (1984) (Applying the Leon exception where "it was the judge, not the police officers, who made the critical mistake."); United States v. Smith, 63 F.3d 766, 769 (11th Cir. 1995) (Determining that suppressing evidence because of judicial error will not serve the deterrent function that the exclusionary rule was designed to achieve.); United States v. Gordon, 50 F.3d 11, 1995 WL 108988, 3-4 (6th Cir. 1995) (Declining to apply the exclusionary rule to bench warrant where defects in warrant were attributable to the municipal judge and/or his staff rather than to any law enforcement agent involved in the case.).

In addition, even if the officers sought the VCO order as a pretext to obtain an opportunity to question defendant Floyd in connection with the Tyrone White investigation, the arrest may not be invalidated on this ground. "'Subjective intentions play no role in

ordinary, probable-cause Fourth Amendment analysis.'" United States v. Jones, 377 F.3d 1313, 1314 (11th Cir. 2004) (citing Whren v. United States, 517 U.S.806 (1996)). "Instead, an arrest will be upheld if the objective circumstances justify the arrest." Id.  As noted above, the officers acted in objectively reasonable reliance on the VCO order in arresting Floyd.  Their subjective intent in serving the warrant is irrelevant. Id.

Entry into the Residence

Defendant argues that the opening of the residence was involuntary and without the consent of the occupants, and it did not create probable cause and exigent circumstances sufficient to justify entry into the residence by the officers.

However, the court cannot conclude that the occupants' consent to open the door was required in this case.  As discussed above, police were at the residence to serve what they reasonably believed was a valid VCO order for Floyd's arrest. They knocked and, in response to an inquiry from within, announced their presence and told the occupants to "open the door."  The officers were within their authority to demand entrance under these circumstances.  As the Eleventh Circuit has indicated, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.  United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000).[8]  Here, because the officers believed n good faith that they

---

[8] In this case, defendant has not argued that police did not have a reasonable belief that the location to be searched was Floyd's dwelling, or that they did not have reason to believe that Floyd was within the dwelling.

11

had probable cause to arrest Floyd under the VCO order, they did not act unreasonably in telling the occupants of the residence to open the door. See United States v. Lauter, 57 F. 3d 212, 214-15 ("As the Supreme Court has observed, once an arrest warrant for a particular suspect has issued, it is constitutionally reasonable to require him to open his doors to the officers of the law.").[9]

Once the door was open and the officers smelled burning marijuana, they clearly had the authority to enter the residence to prevent the destruction of evidence and to secure the premises in order to obtain a search warrant. "[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being

---

[9] In the alternative, the court finds that, in the totality of the circumstances, McCray's decision to open the door was consensual. Police approached the residence in daylight and at a reasonable hour. Although there were at least four officers at the door when the police knocked, there is no evidence that McCray could see the number present, or that she knew that the police were there at all before they identified themselves. The officers at the door were in plain clothes. They knocked only once, not repeatedly, and nothing in the record suggests that their tone was loud or belligerent or that their weapons were drawn. The door was opened within a minute of the knock. Even so, the officers did not immediately storm in. Instead, they arrested Floyd, who exited without incident, before going inside. In addition, when she opened the door, McCray – who was familiar with some of the police who were present -- did not step back and place her hands behind her back, which would have suggested intimidation and a show of force on the part of the officers. See United States v. Ramirez-Chilel, 289 F.3d 744, 751 (2002). Instead, she seems to have simply "yield[ed] the right-of-way" when officers stepped inside, which does not suggest that she was overwhelmed by a show of official authority. McCray also voluntarily showed police the location of a weapon in the bedroom which, again, implies that she had previously given "some sort of implied consent to enter" based on her apparent cooperation. "Whether the consent is deemed involuntary depends upon the amount of threat presented." Tobin, 923 F.2d at 1512. Here, even though the words used by law enforcement were in the imperative, as in United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986) (holding that entry was not consensual when consent was given only after agent with weapon drawn shouted, "FBI. Open up."), the police did not shout "open the door" or draw their weapons. The amount of threat presented in this case, under the totality of the circumstances, was insufficient to constitute the kind of show of authority that would render McCray's decision to open the door non-consensual.

sought is not itself an unreasonable seizure of either the dwelling or its contents." Segura v. United States, 468 U.S. 796, 810 (1984); see also Illinois v. McArthur, 531 U.S. 326, 121 S. Ct. 946, 951-953 (2001) (Officers who had probable cause to believe that a home contained contraband which was evidence of a crime, and who reasonably believed that the resident, if left free of any restraint, would destroy that evidence, were authorized to secure the residence to prevent the loss of evidence while they diligently sought a warrant.). Here, the officers had information prior to their arrival at the residence that Floyd was dealing large amounts of crack cocaine and marijuana from his residence. That information "rose to the level of probable cause when, as the door stood open, [officers] detected what [they] knew from [their] law enforcement experience to be the odor of marijuana." United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991).[10]  "Moreover," as the Eleventh Circuit indicated in Tobin, "the defendant[] and anyone else who might have been present in the house would have been aware of the [officers'] suspicions at that moment. Danger that the defendants or someone else inside the house might destroy the evidence thus provided the exigent circumstances required to justify a warrantless search."  Id.; see also United States v. Morales, 868 F.2d 1562, 1575 (11th Cir. 1989) ("This court has noted that the risk of removal or destruction of narcotics involves exigent circumstances.").  In addition, the officers were entitled to conduct a protective sweep of the residence incident to the arrest of McCray and

---

[10] Sgt. Murray had previously smelled marijuana "probably a thousand times." He and Lt. Holder were 26-year veterans of the Auburn Police department, and Murray had approximately 20 years in narcotics.

Williams to ensure their safety. United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995).

Accordingly, the court concludes that the evidence used by officers to secure the search warrant was not discovered in violation of the constitution and, thus, the drugs and other evidence seized as a result of the execution of that warrant are not due to be suppressed.

Post-arrest Statements

Defendant argues that, because his arrest was illegal, his statements following that arrest must be excluded unless intervening events break the causal connection between the illegal arrest and the confession. Defendant's argument is without merit for two reasons. First, as discussed above, his arrest on the VCO order was not unlawful, as police acted in objectively reasonable reliance on that order in detaining Floyd. Officers had additional probable cause to arrest defendant after they smelled the strong odor of burning marijuana emanating from the door of his residence.

Second, there is no evidence presently before the court that Floyd made any statement in response to official questioning. The facts elicited at the suppression hearing at this case from Lt. Holder were that, after Sgt. Tatum removed a sum of money from Floyd, Tatum called Holder outside. There defendant "made a statement to me, directly to me, that the drugs in the residence were his." Similarly, Sgt. Murray testified that "[s]ome time just briefly after being taken into custody," Floyd "was read his rights by Sergeant James Tatum." Thereafter, Murray said, Floyd made the statement to Tatum that "any drugs found in the house belongs to him basically." No testimony suggested that police solicited these statements or otherwise questioned defendant.

14

"Voluntary and spontaneous comments by an accused, even after <u>Miranda</u> rights are asserted, are admissible evidence if the comments were not made in response to government questioning." <u>Cannady v. Dugger</u>, 931 F.2d 752, 754 (11th Cir.1991); <u>see also</u> <u>United States v. Johnson</u>, 136 Fed.Appx. 279, 283 (11th Cir. 2005). Absent evidence that Floyd's statement(s) were the product of interrogation, the statements are not due to be suppressed. <u>See</u> <u>United States v. Washington</u>, 431 U.S. 181, 187 (1977) ("Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable. ... Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions.").

## Conclusion

Accordingly, for the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that defendant's motion to suppress (Doc. # 20) be DENIED.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before January 26, 2006. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain

error or manifest injustice.  Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982).  See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982).  See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

    DONE, this 18th day of January, 2006.

                                       /s/ Susan Russ Walker
                                       SUSAN RUSS WALKER
                                       UNITED STATES MAGISTRATE JUDGE